Argued January 8, affirmed February 14, petition for rehearing
denied April 9, 1963

STATE LAND BOARD *v.* PEKAREK ET AL

378 P. 2d 735

*Peter A. Schwabe,* Portland, argued the cause for appellants. With him on the briefs was Peter A. Schwabe, Jr., Portland.

*Catherine Zorn,* Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief was Robert Y. Thornton, Attorney General.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and DENECKE, Justices.

O'CONNELL, J.

This is an appeal from a decree of the circuit court of Multnomah county that certain property of the

decedent, Martin Pekarek, escheat to the state of Oregon. The decree is based upon findings that Pekarek was a resident and domiciliary of Czechoslovakia at the time of his death; that at that time he had a savings account of approximately $7,600 in the First National Bank of Portland; that the legatees of his will were residents and nationals of the Republic of Czechoslovakia; that these legatees failed to establish the right to take under ORS 111.070; and that there were no other heirs, legatees, or devisees eligible to take the property. The legatees appeal from the decree.

ORS 111.070 provides as follows:

"(1) The right of an alien not residing within the United States or its territories to take either real or personal property or the proceeds thereof in this state by succession or testamentary disposition, upon the same terms and conditions as inhabitants and citizens of the United States, is dependent in each case:

"(a) Upon the existence of a reciprocal right upon the part of citizens of the United States to take real and personal property and the proceeds thereof upon the same terms and conditions as inhabitants and citizens of the country of which such alien is an inhabitant or citizen;

"(b) Upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign country; and

"(c) Upon proof that such foreign heirs, distributees, devisees or legatees may receive the benefit, use or control of money or property from estates of persons dying in this state without confiscation, in whole or in part, by the governments of such foreign countries.

"(2) The burden is upon such nonresident alien to establish the fact of existence of the reciprocal rights set forth in subsection (1) of this section.

"(3) If such reciprocal rights are not found to exist and if no heir, devisee or legatee other than such alien is found eligible to take such property, the property shall be disposed of as escheated property."

The legatees contend that ORS 111.070 is not applicable to the savings account in this case since the distribution of personal property of the intestate is governed by the law of the decedent's domicile. We construe ORS 111.070 as a declaration of legislative policy limiting the right of nonresident aliens to take any kind of property, real or personal, tangible or intangible, including choses in action in the form of bank accounts. All property interests are intangible whether the subject matter is land, chattels or choses in action. Such interests can have no physical situs. For some purposes it may be necessary or desirable to distinguish between property interests which relate to a tangible subject matter and property interests which have no tangible referrent. There appears to be no reason for making such a distinction in the application of ORS 111.070. The policy which underlies ORS 111.070 restricting the movement of assets out of this state to a nonreciprocating country is equally applicable whether the subject matter of such assets are represented in tangible or intangible form. We are of the opinion that it was the legislative purpose to subject bank accounts to the operation of ORS 111.070.[1]

---

[1] The right of a state legislature to enact statutes controlling the devolution of intangible property is well established. E.g., Standard Oil Co. v. New Jersey, 341 US 428, 71 S Ct 822, 95 L Ed 1078 (1951); Security Bank v. California, 263 US 282, 44

It is next argued that ORS 111.070 is so vague, indefinite, uncertain and contradictory in its provisions that it is invalid. It is pointed out that subsection (2) of ORS 111.070 imposes the burden upon the nonresident alien to establish the existence of the reciprocal rights in subsection (1), and that subsection (3) provides for escheat only if "such reciprocal rights" are not found to exist. We are then reminded that in *State v. Kolovrat,* 220 Or 448, 454, 349 P2d 255, 258 (1960), reversed on other grounds 366 US 187, 81 S Ct 922, 6 L Ed2d 218 (1961), we said that "[i]t is only the 'right to take' which must be reciprocal in character." The provision relating to the "right to take" is found only in subparagraph (a) of subsection (1). Subparagraphs (b) and (c) of subsection (1) relate to the "right to receive." The legatees contend that there is no burden on the nonresident alien to establish the requirements stated in subparagraphs (b) and (c) of subsection (1) since subsections (2) and (3) refer only to "reciprocal rights". In any event they argue that the statute is at least so ambiguous as to render it invalid.

■ The legatees misconstrue the statute. All of subsection (1) concerns reciprocal rights. Subparagraph (a) of subsection (1) spells out the requirement of reciprocity "to take." Here the legislation on the right to take in Oregon must be equated to the legislation on the right to take in the foreign country. Under subparagraph (b) the right of a citizen of the United States to receive is not expressly equated to the right

S Ct 108, 68 L Ed 301, 31 ALR 391 (1923); State v. First Nat. Bank of Portland, 61 Or 551, 123 P 712, Ann Cas 1914B 153 (1912); Commonwealth v. Western Union Tel. Co., 400 Pa 337, 162 A2d 617 (1960), reversed on other grounds 368 US 71, 82 S Ct 199, 7 L Ed2d 139 (1961).

of nonresident aliens to receive. Similarly, the right of foreign legatees and heirs to the use, benefit or control of property from estates of persons dying in Oregon is not expressly equated by subparagraph (c) to the corresponding rights of Oregon legatees and heirs to be free from confiscation of property from foreign estates by Oregon officials. But the right of a nonresident alien to take (stated in the preface to subparagraphs (a), (b) and (c)) is equated to the right of United States citizens to receive as stated in subparagraph (b) and is predicated upon the right of the foreign distributees to receive in their own country as stated in subparagraph (c). Implicit in subparagraphs (b) and (c) is the expression of policy that if United States citizens do not have a right to receive payment within the United States, or if the foreign legatees and heirs will not have the benefits of use, the reciprocal right to receive will be denied the foreign distributee. All of the subparagraphs of subsection (1) must be read together and in relation to the prefatory statement in the subsection. Thus read it becomes apparent that subsection (2) imposes the burden of proof upon the nonresident alien to establish all of the conditions recited in subparagraphs (a), (b) and (c) and that the requirement in subsection (3) that the existence of "such reciprocal rights" be shown relates to all of the conditions in the subparagraphs of section (1).

We are brought, then, to the question of whether the conditions of ORS 111.070 have been established by the legatees. If the legatees fail to establish any one of the conditions stated in subparagraphs (a), (b) and (c) of subsection (1) the property will escheat to the state.

We shall first direct our attention to the evidence

relating to the condition stated in subparagraph (c). The legatees must prove that they will receive the benefit, use or control of the property "without confiscation, in whole or in part," by their government. In support of their contention that this condition was met the legatees introduced into evidence a certificate of the Ambassador of Czechoslovakia to the United States declaring "that heirs or beneficiaries in Czechoslovakia to estates in the United States of America actually receive payment of their inheritance in Czechoslovakia without diminution by taxation or other levies." There was evidence that Czechoslovakian beneficiaries of United States inheritances were able to purchase merchandise from "Tuzex" stores in Czechoslovakia at prices lower than those charged persons using funds from other sources. Dr. Alexander Bozdech, a lawyer practicing in Prague, testified on behalf of the legatees that he had extensive experience in handling estate matters. He stated that funds received in Czechoslovakia from estates in the United States were not subject to confiscation in whole or in part and that Czechoslovakian heirs and beneficiaries had the free uncontrolled use and enjoyment of inheritance funds received by them from the United States.

Dr. Vladimir Masa, First Secretary at the Embassy of Czechoslovakia in Washington, D.C. and Chief of its Consular Division, testified to the same effect, basing his conclusion on his experience in dealing with decedents' estates and related matters while in Czechoslovakia at approximately the time of the decendent's death.

■ The state called Dr. R. J. Chytil as an expert witness on Czechoslovakian law. Dr. Chytil had graduated in 1948 from Charles University in Prague with

a Doctor of Laws degree. He was forced to leave Czechoslovakia in 1948. He had never practiced law but he had worked in a law office from 1945 to 1948 while he was obtaining his law degree. He testified that he had continued to study Czechoslovak law after leaving his homeland. It was his opinion that the right of persons to receive property in Czechoslovakia was closely restricted to accord with the peoples' socialistic order. His testimony was rather general and vague. For the most part it appeared to be conclusions based upon his interpretation of the Czechoslovak statutes and legal documents which he had studied. This was the only expert testimony offered by the state. The state is handicapped in this class of cases because the iron curtain limits the evidence available to it. This was observed in *In re Wells' Estate,* 204 Misc 975, 126 NYS2d 441, 446 (1953) :

> "* * * The greatest difficulty in cases such as this arises from the fact that there can be no free interchange of views between executor and legatee and no opportunity for free investigation by the executors of conditions at the legatee's domicile. From behind the curtain comes only such information as the foreign government will permit. Therefore, we must rely chiefly on what former residents of those countries tell us about conditions there and such other events as necessarily come to the public attention."

The court then noted that "The Federal government and its agencies would, in the normal course of events, have sources of information not available to private individuals." (126 NYS2d at 446) Looking to this source the court took judicial notice of the official findings of the Secretary of the Treasury relating to the control of funds by the Czechoslovakian government, contained in Treasury Department Circular,

1951, No. 655, Supp 7 and now recorded in Title 31 Code of Federal Regulations § 211.3 (a) (Supp 1962) which presently reads as follows:

> "The Secretary of the Treasury hereby determines that postal, transportation, or banking facilities in general or local conditions in Albania, Bulgaria, Communist-controlled China, Czechoslovakia, Estonia, Hungary, Latvia, Lithuania, the Union of Soviet Socialist Republics, the Russian Zone of Occupation of Germany, and the Russian Sector of Occupation of Berlin, Germany, are such that there is not a reasonable assurance that a payee in those areas will actually receive checks or warrants drawn against funds of the United States, or agencies or instrumentalities thereof, and be able to negotiate the same for full value."

This official determination was operative at the date of decedent's death.[2] We regard this official declaration as evidence that foreign beneficiaries would not receive their interests free from control amounting to, at least, a partial confiscation.[3]

---

[2] See the sources of this regulation set out in 31 CFR § 211.3 (a) (1) (1959).

[3] Supporting this conclusion is In re Wells' Estate, supra 126 NYS2d at 446:

> "* * * This determination has received serious consideration in the courts, and where no countervailing evidence is produced, it has sufficed to make it appear that a legatee would not have the benefit, use or control of the money. Matter of Braier's Estate, 305 N.Y. 148, 111 N.E.2d 424; Matter of Geffen's Estate, 199 Misc. 756, 104 N.Y.S.2d 490; Matter of Thomae's Estate, 199 Misc. 940, 105 N.Y.S.2d 844; Matter of Best's Estate, 200 Misc. 332, 107 N.Y.S.2d 224; Matter of Getream's Estate, 200 Misc. 543, 107 N.Y.S.2d 225; Matter of Yee Yoke Ban's Estate, 200 Misc. 499, 107 N.Y.S.2d 221."

The fact that the Treasury Department directive was applicable to public funds is immaterial. As pointed out in Klein's Estate, 203 Misc 762, 123 NYS2d 866, 870 (1952), "The important factor is whether or not there is a reasonable assurance that a distributee will actually receive the moneys to which he is entitled * * *."

We have, then, a conflict of evidence as to whether the condition stated in ORS 111.070 (1) (c) has been met. Assuming, without deciding, that all of the evidence offered by the legatees was admissible, it can be given relatively little weight. The statements of Czechoslovakian officials must be judged in light of the interest which they had in the acquisition of funds for their government. Moreover, in judging the credibility of these witnesses we are entitled to take into consideration the fact that declarations of government officials in communist-controlled countries as to the state of affairs existing within their borders do not always comport with the actual facts. Weighing these official statements together with Dr. Bozdech's testimony against the findings of the Treasury Department and the testimony of Dr. Chytil, we are of the opinion that the legatees failed to carry the burden of establishing the existence of the condition specified in ORS 111.070 (1) (c).

It is not necessary, therefore, to decide whether the conditions specified in subparagraphs (a) and (b) of ORS 111.070 were met.

The decree of the lower court is affirmed.