Harry G. Herman, S.
This is a motion for reargument of the court’s decision (Matter of Draganoff, 43 Misc 2d 233), which denied the application of the law firm of Wolf, Popper, Boss, Wolf & J ones, as attorneys in fact for alien nonresident distributees, for payment of their shares directly to the attorneys in fact for transmission to Bulgaria, and which directed the deposit of the distributive shares with the Commissioner of Finance of Westchester County (Surrogate’s Ct. Act, § 269-a).
When that issue was originally submitted to the court, counsel on both sides stated to the court that in their view no hearing was necessary. The court considered the pleadings but rejected affidavits, letters, price lists and certificates presented by the attorneys in fact as hearsay, and because the introduction of this proposed evidence would not give counsel for the Public Administrator an opportunity to object and cross-examine in the absence of a hearing. The court, however, also held that even if it were not to reject such papers and the matter contained therein as hearsay, they did not establish to the satisfaction of the court that an alien distributee or legatee of a New York estate residing in Bulgaria would get the benefit or use or control of the moneys due him. This conclusion was distinguishable from Matter of Saniuk (40 Misc 2d 437, affd. 21 A D 2d 922, mot. for lv. to app. den. 15 N Y 2d 482) where a hearing *168 was held and no objection was made although the opportunity to do so was afforded (see transcript of hearing, letter of Martin Popper, dated April 27, 1964, and letter of Surrogate Tucker, dated May 1, 1964, in record on appeal) to the consideration of the hearsay materials and where such materials were then properly before the court (Richardson, Evidence [9th ed. by Prince, 1964] § 213, pp. 204-205), and where the court there determined, in the exercise of its discretion, that on the evidence presented the alien nonresident Soviet distributees there involved would receive the benefit or use or control of the moneys due them.
The first ground urged in support of the motion for reargument is that the court erred in concluding (43 Mise 2d 233, 236) that section 269-a of the Surrogate’s Court Act imposes on the court the duty to make its own independent determination as to whether Bulgarian legatees or distributees will receive the benefit or use or control of funds due them, although it is conceded by the movants that “it is not our position that removal of a country from the Treasury Department list necessarily means that the Surrogate must find use, benefit and control.”
This court noted in its prior decision (43 Mise 2d 233, 236) that while the court may consider the fact of removal of a country from Treasury Department Circular No. 655 (which prohibits transmittal of Federal funds to the countries listed therein) on the basic question involved here, such removal may be in furtherance of political, diplomatic or other objectives of the United States and need not be controlling on the question presented.
As to this issue, the motion for reargument is granted, and the court adheres to its prior decision.
The second ground for reargument urged by the attorneys in fact is that they do not have the burden of proof in this case.
Section 269-a of the Surrogate’s Court Act provides:
* ‘ 1. Where it shall appear that a legatee, distributee or beneficiary of a trust would not have the benefit or use or control of the money or other property due him, or where other special circumstances make it appear desirable that such payment should be withheld, the decree may direct that such money or other property be paid into the surrogate’s court for the benefit of such legatee, distributee, beneficiary of a trust or such person or persons who may thereafter appear to be entitled thereto. Such money or other property so paid into court shall be paid out only by the special order of the surrogate or pursuant to the judgment of a court of competent jurisdiction.
“2. In any such proceeding, where it is uncertain that an alien legatee, distributee or beneficiary of a trust, not residing within *169 the United States or its territories, would have the benefit or use or control of the money or other property due him, the burden of proving that such alien legatee, distributee or beneficiary of a trust will receive the benefit or use or control of the money or other property due him shall be upon him or on the person or persons claiming from, through or under him.”
In its prior decision the court held that the attorneys in fact had failed to meet their burden, imposed upon them by subdivision 2 of section 269-a (added by L. 1960, ch. 975, eft. April 28, 1960), of proving that the alien nonresident distributees will receive the “benefit or use or control” of their distributive shares.
They contend that until it has been proved by competent evidence that it is uncertain that the alien nonresident distributees would have the benefit or use or control of the funds due them, the burden of proof does not shift to them. They further argue that the fact that Bulgaria is an “ iron curtain ” country is not, by itself, sufficient to establish this uncertainty.
These arguments were previously considered and rejected by this court with regard to Poland in Matter of Buszta (18 Misc 2d 716-717). The Court of Appeals has taken notice that the Surrogate’s Courts have withheld the distributive shares or legacies of nonresident aliens ‘ ‘ because of the special circumstances in which the beneficiaries find themselves as domiciliarles in an iron-curtain country ” (Matter of Geiger, 7 N Y 2d 109, 112).
Courts are not required to work in a vacuum. They are allowed to recognize that while the Communist movement may no longer be monolithic, past actions by the governments of “ iron curtain ” countries in appropriating foreign inheritances by one means or another do create “ special circumstances [which may] make it appear desirable that such payment should be withheld ” (¡Surrogate’s Ct. Act, § 269-a); and it is such and other actions of governments which motivated the Legislature to enact section 269-a and its predecessor enactments which have created the uncertainty that the alien nonresident distributees or legatees of an “ iron curtarn ” country will have the benefit or use or control of the funds due them (Matter of Geiger, 12 Misc 2d 1043, 1044, affd. 7 AD 2d 1004, affd. 7 N Y 2d 109, 112; Matter of Geffen, 199 Misc. 756; Matter of Getream, 200 Misc. 543, 544; Matter of Klein, 203 Misc. 762, 765-767; Matter of Reidl, 39 Misc 2d 805, 807; Matter of Schmiedl, N. Y. L. J., March 24, 1964, p. 14, col. 3). This uncertainty does exist in these countries, as opposed to countries such as Great Britain (see Matter of Geffen, supra), which also has currency controls.
*170 The reasons for the enactment of section 269-a, and its predecessor statute, and for the legislative policy against transfer of estate funds to these and other countries which arouse like suspicions as to whether the funds are actually received by those entitled thereto without confiscation in whole or in part or dilution are convincingly set forth in Matter of Weidberg (172 Misc. 524, 527-528); Matter of Bold (173 Misc. 545, 547) and Matter of Wells (204 Misc. 975, 977-978).
As recently as last October, Surrogate Cox clearly stated in Matter of Frederick (N. Y. L. J., Oct. 22, 1964, p. 16, col. 4): “ Section 269-a of the Surrogate’s Court Act was enacted by the Legislature to make sure that legatees and distributees who reside behind the Iron Curtain would have ‘ the benefit or use or control ’ of the property due them without interference or confiscation by an oppressive government * * * The burden of proving that the alien legatee ‘ will receive the benefit or use or control of the money or property ’ rests upon her and can only be decided after a hearing (sec. 269-a, subdiv. 2, Surrogate’s Court Act).”
The fact that an “ iron curtain” country has been removed from Treasury Department Circular No. 655, which, as noted before, prohibits transmittal of Federal funds to the countries listed therein, does not remove from the claimant residing there the burden of proving he will have the benfit or use or control of the money or other property due him and does not necessarily by itself dispel the uncertainty referred to in subdivision 2 of section 269-a (Matter of Buszta, supra, p. 717).
As to this issue, the motion for reargument is granted, and the court adheres to its prior decision.
The attorneys in fact further argue that withholding payment of estate funds because the legatees or - distributees reside in “ iron curtain ” countries is a political, not a judicial judgment and enters a field reserved to the State Department of the United States.
This argument is fallacious and was rejected on the original submission of this case (43 Misc 2d 233, 237), since the power of regulating the devolution and distribution of decedents’ estates resides exclusively in the .States in the absence of an overriding, treaty (Matter of Braier, 305 N. Y. 148, app. dsmd. for want of a substantial Federal question sub nom. Kalmane v. Green, 346 U. 8. 802). The enactment of section 269-a was neither a political nor a judicial judgment, but was a legislative determination made for the reasons set forth in Matter of Weibberg (supra); Matter of Bold (supra) and Matter of Wells (supra).
*171 As to this issue, the motion for reargument is granted, and the court adheres to its prior decision.
In its prior decision (43 Mise 2d 233, 239) the court held that the shares of the Bulgarian distributees should be deposited pursuant to section 269-a of the Surrogate’s Court Act until “ such time as it can be demonstrated that conditions in Bulgaria justify the belief that the distributees will receive the full value of their distributive shares ”.
In connection with this motion for reargument a trial was held on the question of whether the Bulgarian distributees herein will actually receive “ the benefit or use or control ” of their distributive shares. Thus, as to this issue, the motion becomes not a motion for reargument but an application for leave to renew a motion previously denied (Carmody-Forkosch, N. Y. Prac. [1963], § '573, pp. 516-517). The application to renew the motion for payment of the distributive shares to the attorneys in fact for transmission to Bulgaria is granted, and the renewed motion will now be considered on the merits.
A press release, an agreement between the United States and Bulgaria, and a letter from the Treasury Department were received in evidence only for the purpose of establishing that Bulgaria has in fact been removed from the aforesaid Treasury Department Circular No. 655.
Peter Stephanov, a Bulgarian attorney specializing in civil family and inheritance law and a member and manager of a “law firm” in Sofia named “Lawyers Office specializing in work with foreign countries”, testified that a decree of the Presidium of the National Assembly effective January 5, 1965, removed the inheritance tax on inheritances received from estates outside of Bulgaria, although inheritance taxes continue on inheritances from Bulgarian estates; and that no deductions, governmental or nongovernmental, are made from the amount which the Bulgarian is entitled to receive from the foreign estate, except for attorneys’ fees.
He also testified that there is no requirement that such Bulgarian citizen use his “ firm ”; that the distributees herein had told their acquaintances that they had not received any news from their uncle, Todor Draganoff; that these “ acquaintances ” recommended his “ firm ”; that his “ firm ” requested the New York City law firm of Wolf, Popper, Boss, Wolf & Jones “ to check what is the situation with Todor Draganoff”; that after a time the latter firm advised his ‘ ‘ firm ’ ’ that Todor Draganoff had died and left an estate; and that the distributees then engaged his “ firm ” to represent them and agreed to their fee *172 and that of the correspondent firm, Wolf, Popper, Boss, Wolf & Jones.
He further testified that funds received from United States estates can he used ‘ ‘ in exactly the same way as a Bulgarian may use money that he earns from his work or gets from any other way * * * in Bulgaria ’ ’; that such funds cannot be used for trade; that the distributee cannot leave the funds in the United States by depositing them in a savings bank, by buying. stocks here or by spending them here by sending orders to American department stores, and cannot invest them in a foreign country without permission of the Bulgarian Ministry of Finance; that if he does so without permission he is subject to a fine, and if a substantial sum is involved, to a prison sentence; that he did not know if such permission had ever been requested or, if it was, whether it had been granted; and that the distributee can receive the funds only in Bulgarian currency, ‘ ‘ leva ’ but not in American dollars.
Mr. Stephanov testified that the method by which the beneficiary gets his funds from the United ¡States is: “ The Foreign Trade Bank informs the beneficiary that he has received a certain sum of money, the sum he has inherited, and he can go to the bank and receive this money either in Bulgarian leva or transfer them into foreign currency in the Corecom.”
His later testimony was that no account is opened in Corecom, but that an account is opened in the Bulgarian National Bank to be used in Corecom.
The value of his inheritance is given to the Bulgarian distributee in Bulgarian currency at a rate of exchange of 2 leva for 1 dollar, with which, it was testified, he can open a savings bank account, buy a house, automobile, or available consumer goods, give the money away to a friend or relative, or dispose of it by will. If he opens an account to be used in Corecom, a government enterprise “ supplying * * * foreign currency to citizens of Bulgaria * * * including such merchandise as i's otherwise not available in general stores, because Corecom imports goods of all kinds ”, which has stores throughout Bulgaria and which widely advertises its wares, he may make his purchases at cheaper prices than in other stores in Bulgaria. He may also purchase .Corecom bonds.
On the basis of cheaper Corecom prices as compared with higher prices in other Bulgarian stores, Mr. Stephanov testified, the Bulgarian distributee therefore would receive from 2% to 5 leva to the dollar. If this were so, then prices in Corecom would be from 25% to 150% cheaper than in other stores in Bulgaria. *173 The court views this testimony with extreme scepticism. Nothing else appears in the record to substantiate or corroborate such testimony.
Clifford J. Phillips, a branch manager of Chemical Bank New York Trust Company, testified that the official rate of exchange was lower than the “gray market” or “black market” in currency; that more than two leva per American dollar could thus be obtained.
Invoking the provisions of CPLB 4511 (subd. [d]) the court takes judicial notice, ascertained by correspondence with the international division of the Manufacturers Hanover Trust Company, that on October 21,1964 “ [t]he market in New York for actual Bulgarian bank notes is $0.29' per Leva bid and $0.32 per Leva offered.” This establishes a market place rate of exchange of 3.1 leva to the dollar bid and 3.4 leva to the dollar offered, as compared with the official rate of 2 leva to the dollar (cf. Matter of Greenberg, N. Y. L. J., June 16, 1964, p. 14, cols. 3-4).
Moreover, Mr. iStephanov further testified that the attorneys ’ fee charged in this estate pursuant to agreement with the distributees would be 24% of the net proceeds of the distributive shares —4% to his firm and 20% to the law firm of Wolf, Popper, Boss, Wolf & Jones. No showing was made or attempted to be made as to whether 24% of the aggregate shares of these distributees is a reasonable fee for services rendered (cf. Matter of Geiger, 7 N Y 2d 109, 112, supra).
The court cannot disregard the fact that Mr. Stephanov is not a free and independent attorney, an impression he sought to create, but is a member of a lawyers’ collective (cf. Matter of Mitzkel, 36 Misc 2d 671, 675-676), subject to the restrictive pressure's commonly applied in “ iron curtain” countries. As he was about to return to Bulgaria, he could not be expected to say anything in derogation of his government or its fiscal policies. His testimony does not convince the court that the official rate of exchange for leva reflects the true value of the leva or that the distributive shares of these distributees are not subject, by means of an unfavorable rate of exchange applied after the deduction of 24% for fees, to such a dilution as to deprive the distributees of the full benefit or use of their distributive shares.
Accordingly, the court finds that the proof in this proceeding is not of a character sufficient to convince the court that under the method of transmission to Bulgaria and the above-enumerated restrictions, the alien distributees residing there would *174 get “ the benefit or use or control ” of their distributive shares in this estate within the meaning of section 269-a of the Surrogate’s Court Act.
The renewed motion for payment of the distributive shares to the attorneys in fact is denied. The funds will be deposited with the Commissioner of Finance of Westchester County.